UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

BRANDON CHARLESTON,                          :
                                             :
            Petitioner,                       :
                                             :
      v.                                      :            No. 2:15-cv-01437
                                             :
                                             :
ROBERT D. GILMORE, *Superintendent*          :
*at SCI-Greene*;[1]                           :
THE ATTORNEY GENERAL OF THE STATE            :
OF PENNSYLVANIA;                             :
THE DISTRICT ATTORNEY OF                     :
PHILADELPHIA COUNTY,                         :
                                             :
            Respondents.                      :
_____          :

## O P I N I O N

**Report and Recommendation, ECF No. 21 – Adopted in part**

**Joseph F. Leeson, Jr.**                                    **March 29, 2018**
**United States District Judge**

## I.      Introduction

Brandon Charleston has filed a counseled Petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254. He is challenging his August 2009 conviction for murder in the first degree

and possession of an instrument of crime, following a trial by jury before the Honorable George

W. Overton in the Court of Common Pleas of Philadelphia County. ECF No. 1. The charges

arose from the June 15, 2008 shooting death of William Stanton inside the residence located at

_____

[1]      As Magistrate Judge Hey explained in her Report and Recommendation, although
Charleston named John Wetzel, the Secretary of the Pennsylvania Department of Corrections, as
the Respondent in this case, because Charleston is currently incarcerated at the Greene State
Correctional Institution at Waynesburg ("SCI-Greene"), Robert D. Gilmore, the Superintendent
at SCI-Greene, has direct custody of Charleston and is the proper defendant.

2428 North 25th Street in Philadelphia. In September 2009, Judge Overton sentenced Charleston to life imprisonment for the murder and a concurrent term of 3 to 24 months' imprisonment for the weapons offense.

Upon review of Charleston's Petition, United States Magistrate Elizabeth T. Hey issued a Report and Recommendation (R&R) recommending that the Petition be denied. ECF No. 21. Charleston timely filed objections to the R&R. ECF No. 24. After de novo review and for the reasons set forth below, the R&R is adopted in part and the Petition is denied.

## II.     Factual and Procedural History

The Court adopts the factual and procedural history as summarized by Magistrate Judge Hey in the R&R, as there are no objections to this portion of the R&R.

## III.    Standard of Review

When objections to a report and recommendation have been filed under 28 U.S.C. § 636(b)(1)(C), the district court must make a de novo review of those portions of the report to which specific objections are made. *Sample v. Diecks*, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989); *Goney v. Clark*, 749 F.2d 5, 6-7 (3d Cir. 1984) ("providing a complete de novo determination where only a general objection to the report is offered would undermine the efficiency the magistrate system was meant to contribute to the judicial process"). "District Courts, however, are not required to make any separate findings or conclusions when reviewing a Magistrate Judge's recommendation de novo under 28 U.S.C. § 636(b)." *Hill v. Barnacle*, 655 F. App'x. 142, 147 (3d Cir. 2016). The district court "may accept, reject, or modify, in whole or in part, the findings and recommendations" contained in the report. 28 U.S.C. § 636(b)(1)(C) (2009).

**IV.    Analysis**

Charleston's Petition presents five claims for relief. First, he contends that the Pennsylvania courts acted contrary to clearly established federal law, under *Miranda*[2], in allowing the admission at trial of a statement he made to a detective while in custody. Second, he contends that the admission of evidence of his tattoo deprived him of a fundamentally fair trial. Charleston's third, fourth, and fifth claims each assert the ineffective assistance of trial counsel. Specifically, he claims he was deprived of effective assistance of counsel when his counsel (1) failed to request a proper instruction to the jury regarding the hearsay testimony of a witness; (2) failed to object when, in the course of the trial judge's closing instructions to the jury, the judge advised the jury that Charleston's "reputation for telling the truth is bad"; and (3) failed to ask that the jury be instructed as to the possible verdict of involuntary manslaughter.

The Magistrate Judge, in her R&R, recommended denying relief on each of these five claims. Charleston's Statement of Objections to the R&R presents five objections, or sets of objections, to the Magistrate Judge's analysis of each claim. The Court addresses Charleston's objections in turn. As explained below, although the Court agrees with the Magistrate Judge that Charleston is not entitled to relief on any of the five grounds presented in his Petition, the Court departs from the R&R's analysis in some respects and, accordingly, adopts the R&R in part.

**A.    Objection One, concerning the admission of Charleston's statement, is overruled.**

   **i.    Introduction**

Charleston's first objection to the R&R concerns the admissibility of a statement he made to Homicide Detective Greg Singleton. As explained in detail below, Charleston was taken into

---

[2]    *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (holding that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.").

police custody the evening of July 16, 2009, and was questioned by Detective Singleton the following morning. After obtaining some biographical information from Charleston, the detective asked Charleston about the circumstances of Stanton's death, and Charleston "described his involvement in the incident." The detective then provided the *Miranda* warnings to Charleston and took a formal statement from him, which the detective transcribed.

In a pretrial motion, Charleston moved to suppress his formal post-warning statement,[3] arguing that it was coerced in violation of *Miranda*. After a suppression hearing, the motion was denied, and the post-warning statement was read into the record during the trial. The Pennsylvania Superior Court affirmed the trial court's ruling that the statement was admissible.

In his present Petition, Charleston contends that Detective Singleton deliberately withheld the *Miranda* warnings until after he had obtained a confession (i.e., the initial, pre-warning statement) and that the formal, post-warning statement was therefore inadmissible under the rule established by the United States Supreme Court in the case of *Missouri v. Seibert*, 542 U.S. 600 (2004). The Magistrate Judge, in the R&R, found that Charleston's statement was admissible under *Seibert* and that Charleston was not entitled to relief on this claim. Charleston objects to this analysis and contends that *Seibert*, properly understood, renders his formal, post-warning statement inadmissible.

### ii. Factual and procedural background

The factual background of Charleston's statement is as follows. Around 9:00 p.m. on July 16, 2008, approximately one month after William Stanton's death, Philadelphia Police Officer Anthony Soliman and his partner, responding to a 911 call concerning the presence of a homicide suspect in the area, drove to 25th and Hagert Streets, where they encountered

---

[3] The government did not introduce the pre-warning statement at trial and the admissibility of that statement is not at issue here.

Charleston, who matched the description of the suspect. Suppression Hearing, N.T., Aug. 17, 2009, at 8-34 (hereinafter "Suppr. N.T."). The officers told Charleston that they needed to ask him some questions but that he was not under arrest, and they asked him to sit in their police car. *Id.* at 10, 30. Charleston agreed to do so. *Id.* at 10, 30. While Charleston was sitting in the car, Clara Stanton, the mother of the victim, approached the officers and told them that she was the one who had called 911 and that Charleston had murdered her son, William Stanton. *Id.* at 12-13. Officer Soliman asked Charleston what he knew about William Stanton, and Charleston stated that he knew nothing. *Id.* at 14, 39, 43-44. Officer Soliman then called the Homicide Unit, and Detective Singleton, who had been investigating the Stanton murder, told Officer Soliman to handcuff Charleston and bring him to the station. *Id.* at 14, 80; Trial N.T., Aug. 24, at 5-12.[4] Officer Soliman told Charleston that some detectives wanted to talk to him, and the officers brought Charleston to the Homicide Unit of the police station, where they arrived at about 9:35 p.m. Suppr. N.T. at 33, 36.

After Charleston was brought to the station, Officer Soliman, along with Detective Singleton, took Charleston into an "interview room." *Id.* at 35, 52, 79. Officer Soliman did not know if the door was locked, but both Officer Soliman and Detective Singleton acknowledged that Charleston was not free to leave at that point. *Id.* at 35, 80.

---

[4]     At the suppression hearing, Detective Singleton testified that, as part of his investigation, he had taken the statement of a man named Gary Outlaw, who had told the detective that he saw Charleston and Stanton enter the residence at 2428 North 25th Street shortly before the shooting and that later that evening Charleston confessed to him that he had shot Stanton. *See* Suppr. N.T. at 48-51. Detective Singleton testified that Outlaw's statement was one of the main reasons he wanted to speak with Charleston. *Id.* at 51-2.

    Ultimately, the contents of Outlaw's statement were not presented at trial, nor did Outlaw testify at trial. Rather, the jury heard testimony that police officers served Outlaw with a subpoena to appear on the first day of trial and that, after he failed to appear, Judge Overton issued a bench warrant for him, but the officers were unable to locate Outlaw to execute the warrant. *See* Trial N.T., Aug. 24, at 5-12.

Detective Singleton testified that after he helped place Charleston in the interview room that evening, he briefly spoke with Charleston but declined to interview him at that time because he appeared to be "under the influence of either alcohol or some narcotics substance." *Id.* at 51-53. Detective Singleton did not mention to Charleston anything about the Stanton killing. *Id.* at 54. The detective left Charleston alone in the room at about 10:00 p.m. and did not see him again until 10:00 a.m. the next morning. *Id.* at 78-79, 88.

At 10:00 a.m. the next morning, Detective Singleton, along with another detective, returned to the interview room where Charleston had been placed. Detective Singleton observed that Charleston "appeared to be sober and more coherent," and he gave him a cheese sandwich and water. *Id.* at 54, 90. He began asking Charleston biographical questions in order to fill out a biographical form. *Id.* at 54. Charleston was cooperative in answering these questions. *Id.* at 55. After Detective Singleton completed the biographical form, he "asked [Charleston] about the circumstances surrounding the murder of William Stanton, and [Charleston] explained in some detail what occurred in the house." *Id.* at 56. Detective Singleton testified that when he first started speaking to Charleston about the incident, Charleston "was immediately receptive." *Id.* at 71.[5]

Detective Singleton testified that, after Charleston explained what occurred in the house, "[a]t some point, I stopped [Charleston] and read him his rights and prepared the memorandum

---

[5] The testimony in this paragraph is taken from the pretrial suppression hearing. At trial, Detective Singleton similarly testified that after completing the biographical form, he "asked [Charleston] about the incident involving the murder of William Stanton. And he described his involvement in the incident." *See* Trial N.T., Aug. 21, at 154. Detective Singleton also testified at trial that when he first asked Charleston about the incident, Charleston was "eager to speak with [him]" and was "very calm and cooperative." *Id.* Further, Detective Singleton testified that when he spoke with Charleston, he did not tell Charleston about any evidence that he (Detective Singleton) already had about the case. *Id.* at 193.

form for . . . the sheets, the warnings for his rights, and he signed off on them." *Id.* at 56.[6]

Specifically, Detective Singleton used a "75-331 form," which "reflects the warnings and the

information on who's being interviewed, the date, time, location, who's interviewing and who's

present at the time of the interview." *Id.* at 57. Detective Singleton testified that, as reflected on

the form, he read a series of warnings to Charleston concerning his rights to remain silent and to

have an attorney, and Charleston provided his signature or initials under each warning,

signifying that he understood his rights. *Id.* at 57-60.

Detective Singleton testified that he provided the *Miranda* warnings to Charleston at

approximately 10:20 a.m. *See* Trial N.T., Aug. 21, at 160.[7] After Charleston signed the forms

waiving his *Miranda* rights, Detective Singleton "then proceeded to take a statement from

[Charleston], a formal statement." Suppr. N.T. at 56. In so doing, Detective Singleton asked

Charleston a series of questions about the shooting, and the detective transcribed the questions

and answers onto the above-mentioned 75-331 form, after which Charleston reviewed and signed

the form, as well a "statement adoption attestation form." *Id.* at 56-70. The interview was

completed at 12:20 p.m. *Id.* at 69. Detective Singleton testified that Charleston "seemed very

cooperative and eager to tell his portion of the story" during the course of making his statement.

*Id.* at 70. The interview was completed at 12:20 p.m., about two hours and twenty minutes after

it had begun. *Id.* Later that day, Charleston was formally arrested for Stanton's murder. *Id.* at 71.

In Charleston's formal statement, which Detective Singleton read into the record during

the suppression hearing and at trial, Charleston stated that on June 15, the day of the shooting, he

---

[6]     Similarly, at trial, Detective Singleton testified that, after Charleston described his involvement in the incident, "at some point I stopped him and I read him his rights and we proceeded to take a formal interview." *See* Trial N.T., Aug. 21, at 154.

[7]     Detective Singleton also testified that "[m]aybe 20 minutes elapsed" from the time he completed the biographical form and took Charleston's statement. *Id.* at 187-88.

and Stanton were standing outside on the street "talking about the Xanies" (Xanax pills) that Charleston wanted to buy from Stanton, when they decided to enter the residence on 2428 North 25th Street to conduct the transaction. *Id.* at 62, 65, 66. After they entered the residence, they began to argue about the pills, at which point, according to Charleston's statement, "[Stanton] pulled out the gun and I started rustling with him over the gun. While I was rustling with him, the gun went off about three times. I took the gun and left the house threw it into the sewer right on the corner of [25th] Street." *Id.* at 63. Charleston stated that the gun was "in both of our hands" when the shots were fired. *Id.* He added that "[i]t was self-defense" and "[i]t's not like I pointed it at him and shot him or nothing like that." *Id.* at 69.

Before trial, Charleston moved to suppress his formal, post-warning statement, arguing that, among other things, he was subjected to coercive conditions when he was kept in the interview room overnight. *Id.* at 105. The trial judge held a suppression hearing, at the conclusion of which he denied the motion, finding that the *Miranda* warnings were properly given, that there was "no evidence of coercion," and that, on the contrary, there was evidence of a lack of coercion, "given the provisions of food and the ability to sleep to ward off the effects of substances which caused the intoxication." *Id.* at 115-19.

On direct appeal, the Pennsylvania Superior Court affirmed the trial court's denial of Charleston's motion to suppress his statement. *See Com. v. Charleston*, 16 A.3d 505 (Pa. Super. Ct. 2011), *abrogated on other grounds by In re L.J.*, 79 A.3d 1073 (Pa. 2013). In his present Petition, Charleston contends that the Pennsylvania courts' determination that his statement was

admissible at trial was contrary to clearly established federal law, particularly as set forth by the United States Supreme Court in the case of *Missouri v. Seibert*, 542 U.S. 600 (2004).[8]

### iii. United States Supreme Court case law on "two-step interrogations"

The interrogation at issue in this case is an example of what is known as a "two-step interrogation" (or "two-stage interview" or "question-first procedure"), in which officers first elicit a custodial statement without providing *Miranda* warnings and then, after providing the warnings, elicit a second statement. In this case, as detailed above, Detective Singleton initially elicited a statement from Charleston about his involvement in the Stanton murder and then, after obtaining this initial statement, read Charleston his *Miranda* rights and obtained a formal statement, which the detective transcribed and which was introduced at trial. In cases involving two-step interrogations, generally the initial, pre-warning statement is clearly inadmissible. Here, as noted above, there was no attempt to introduce Charleston's initial statement at trial. But often a contested issue in such cases, as here, is whether the second, post-warning statement is admissible. As the Magistrate Judge observed, an overview of the relevant United States Supreme Court case law on this issue is helpful in order to understand the parties' arguments concerning what constitutes "clearly established Federal law" in this area.

Two-step interrogations were first specifically addressed by the Supreme Court in the case of *Oregon v. Elstad*, 470 U.S. 298 (1985), in which an officer inadvertently elicited a

---

[8]     Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petition for habeas corpus may be granted only if the state court's adjudication of the claim (1) "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision by a state court is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of" the Supreme Court "and nevertheless arrives at a result different from [the Court's] precedent." *Price v. Vincent*, 538 U.S. 634, 640 (2003).

custodial statement prior to administering *Miranda* warnings and then, after providing the warnings, obtained a more complete statement. Reversing the state court's determination that the second statement must be suppressed, the Supreme Court held that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to the second statement. *Id.* at 314. Rather, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made" and, "[a]s in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Id.* at 318. The Court held that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314.

Nearly twenty years later, in *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court again confronted a two-step interrogation, but under a very different set of facts. Whereas the initial interrogation in *Elstad* had been brief and inadvertent, the technique used in *Seibert* revealed a police strategy that was, by the officers' own admission, "adapted to undermine the *Miranda* warnings" and included pre-warning questioning that was "systematic, exhaustive, and managed with psychological skill." *See id.* at 616 (2004) (plurality). Although a majority of the Court determined that the suspect's post-warning statements in *Seibert* must be suppressed, the Justices were unable to agree on a majority opinion. Rather, the result in *Seibert* included a plurality opinion authored by Justice Souter, in which three other Justices joined; a concurrence by Justice Breyer, who joined the plurality opinion but wrote separately to articulate his own test;

and an opinion by Justice Kennedy concurring in the judgment only. The four remaining Justices dissented.

Justice Souter's plurality opinion in *Seibert* concluded that the admissibility of statements made after a two-step interrogation depends on "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object," based on an objective inquiry from the perspective of the suspect, in which the following five factors should be considered:

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615 (plurality). The plurality opinion noted that "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here . . . the focus is on facts apart from intent that show the question-first tactic at work." *Id.* at 617 n.6.[9]

Justice Kennedy, concurring only in the judgment, wrote that he agreed with the plurality's decision that Seibert's statements must be suppressed and he "agree[d] with much in the careful and convincing opinion for the plurality," but he wrote separately to set forth his own approach, which differed from the plurality's approach "in some respects." *Id.* at 618 (Kennedy, J., concurring). Justice Kennedy explained that he believed that the plurality's test, which "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations, . . . cuts too broadly." *Id.* at 621-22. In particular, Justice Kennedy believed that applying "a multifactor test . . . to every two-stage

---

[9]     Justice Breyer, although joining the plurality, wrote separately to state that he would adopt the following rule: "Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." *Id.* at 617 (Breyer, J., concurring). He considered this test functionally equivalent to the plurality's approach, and he also expressed agreement with Justice Kennedy's concurring opinion "insofar as it is consistent with [the "fruits" test] and makes clear that a good-faith exception applies." *Id.*

interrogation" could undermine the clarity of *Miranda*. *Id.* at 622. Instead, Justice Kennedy wrote that he "would apply a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* In other words, under Justice Kennedy's approach, the court begins by asking whether a "deliberate two-step strategy has been used." *Id.* If so, then "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.*[10] If, however, a deliberate two-step strategy was not employed, then the court should apply the test previously articulated by the Supreme Court in *Elstad*, and the question simply would be whether the subsequent statement was voluntary. In sum, for Justice Kennedy, "[w]hen an interrogator uses [a] deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id.* at 621.

Finally, Justice O'Connor, writing for the four dissenters, rejected the plurality's approach because she believed it gave "insufficient deference to *Elstad*," but she also disagreed with Justice Kennedy's approach, believing that it placed improper weight on the subjective intent of the officer. *Id.* at 622-29 (O'Connor, J., dissenting).

Following the Supreme Court's decision in *Seibert*, a clear majority of Circuit courts have held that Justice Kennedy's concurrence is the controlling opinion in the case. This majority includes the Third Circuit, which held in *United States v. Naranjo*, 426 F.3d 221 (3d

---

[10] Such measures "should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* Examples of such curative measures include "a substantial break in time and circumstances" between the prewarning statement and the *Miranda* warning" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.*

Cir. 2005), that "Justice Kennedy's opinion provides the narrowest rationale for resolving the issues raised by two-step interrogations where *Miranda* warnings are not administered until after police obtain an inculpatory statement." *Id.* at 231-32. But in view of the divided nature of the *Seibert* decision, a small minority of Circuit courts have indicated that the *Seibert* case lacks a clear holding. *See Reyes v. Lewis*, 833 F.3d 1001, 1002 (9th Cir. 2016) (collecting cases).

### iv. The Pennsylvania Superior Court's decision, Charleston's Petition, and the Magistrate Judge's Report and Recommendation

In upholding the denial of Charleston's pretrial motion to suppress, the Pennsylvania Superior Court closely examined the United States Supreme Court's decisions in *Elstad* and *Seibert*. Specifically rejecting the Third Circuit's holding in *Naranjo* and similar cases from other Circuits, the Superior Court concluded that "*Seibert* establishes no new binding precedent." *Charleston*, 16 A.3d at 525. In this respect, the court stated that it was persuaded by a dissenting opinion authored by the Honorable Marsha S. Berzon of the Ninth Circuit, who reasoned that "while Justice Kennedy's was the crucial fifth vote for the result . . . Justice Kennedy's opinion is *not* the narrowest opinion embodying a position supported by at least five Justices in the majority" because his intent-based approach was "squarely rejected by seven Justices," i.e., the four dissenters as well as three of the four Justices who joined the plurality opinion. *Id.* at 525 (quoting *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1138-40 (9th Cir. 2005) (Berzon, J., dissenting)).[11] The Superior Court concluded that because *Seibert* did not establish new precedent, the court was required to apply the standard set forth in the Supreme Court's earlier *Elstad* case. *Id.*

---

[11]     Judge Berzon concluded that of the four members of the plurality, only Justice Breyer, in his concurrence, arguably agreed with Justice Kennedy's "subjective-intent-of-the-interrogator position." *See Rodriguez-Preciado*, 399 F.3d at 1140 (Berzon, J., dissenting).

Applying that standard, the Superior Court focused on whether Charleston's post-warning statement was knowing and voluntary. The court reviewed Detective Singleton's testimony that he read Charleston his rights, that Charleston was "immediately receptive" and was "very cooperative and eager to give his portion of the story," and that Charleston was given something to eat and drink during the interrogation. *Id.* at 526. "Under these circumstances," the court had "no difficulty concluding that [Charleston's] waiver of his rights and the subsequent statement were both knowing and voluntary." *Id.*

Charleston contends that the Superior Court's decision was contrary to clearly established federal law. That is, he contends that Justice Kennedy's concurrence in *Seibert* is clearly established federal law and that, under that standard, he was entitled to the suppression of his statement. In particular, he contends that the "sequence of interrogation demonstrates that the detectives deliberately withheld *Miranda* warnings until after obtaining a confession"; in other words, "the initial violation of *Miranda* was not merely hapless or inadvertent but was clearly the result of an intentional withholding designed to prevent [him] from invoking his rights in order to obtain a confession." Pet'r's Mem. Supp. 3, 5, ECF No. 9.

Respondents contend that, despite the Third Circuit's holding in *Naranjo*, Justice Kennedy's opinion is not clearly established federal law in light of the diversity of approaches that other federal Circuit courts (and state courts) have taken to *Seibert*. Further, Respondents contend that even if Justice Kennedy's concurrence were clearly established federal law, Charleston would not be entitled to relief, because there is no evidence that Detective Singleton deliberately withheld the *Miranda* warnings prior to Charleston's initial statement. Finally, Respondents contend that even if the state court's ruling was contrary to clearly established federal law, Charleston cannot show that the admission of his statement "had substantial and

injurious effect or influence in determining the jury's verdict," under the standard set forth by the United States Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).[12]

The Magistrate Judge reviewed the relevant case law in this area, including the Third Circuit's decision in *Naranjo*, and ultimately concluded that the Court need not decide whether Justice Kennedy's concurrence is clearly established federal law. Rather, the Magistrate Judge agreed with Respondents that, even under Justice Kennedy's approach, Charleston's statement would be admissible because "there is no evidence in the record that Detective Singleton's failure to Mirandize Charleston was purposeful or part of a two-stage technique as in *Seibert*." R&R 23. The Magistrate Judge proceeded to review the Superior Court's analysis under *Elstad* and concluded that the Superior Court's decision was neither contrary to nor an unreasonable application of *Elstad*, nor did it result in an unreasonable determination of the facts.[13]

Objecting to the Magistrate Judge's analysis, Charleston contends that "[t]he absence in the record of any specific reason for the omission of *Miranda* warnings prior to the first stage of interrogation should be held against the Respondent, not the Petitioner, as the Magistrate Judge has apparently concluded." Pet'r's Statement of Objections 11, ECF No. 24 (hereinafter "Pet'r's Objections"). He argues that there "should be no presumption that the failure to provide warnings was not deliberate, especially in a case where the detective conducts a second interview with full warnings." *Id.* at 11-12.

---

[12]   *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding that a federal court may grant habeas relief based on trial error only when that error "'had substantial and injurious effect or influence in determining the jury's verdict'" (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))).

[13]   Charleston has not challenged the state courts' or the Magistrate Judge's *Elstad* analysis as such; rather, as discussed above, Charleston maintains that *Seibert*, not *Elstad*, is controlling in this case. In any event, the Court adopts the Magistrate Judge's determination that Superior Court's decision is neither contrary to nor an unreasonable application of *Elstad* and did not result in an unreasonable determination of the facts.

### v. De novo review

At the outset, this Court acknowledges that the question of whether Justice Kennedy's concurrence is "clearly established Federal law" for the purposes of habeas corpus review is not easy to resolve. As mentioned above, a clear majority of the Circuit Courts—including the Third Circuit—have held that Justice Kennedy's concurrence constitutes the holding in *Seibert*. Dissenting from this majority, however, one Circuit court has held that *Seibert* lacks a clear holding, *see United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015) ("[W]e conclude that *Seibert* did not announce a binding rule of law with respect to the admissibility standard for statements given subsequent to midstream *Miranda* warnings."), and a number of other Circuit courts have found the matter to be uncertain, *see United States v. Widi*, 684 F.3d 216, 221 (1st Cir. 2012) ("[H]ow to read the split decision in *Seibert* may be an open question.");[14] *United States v. Heron*, 564 F.3d 879, 885 (7th Cir. 2009) ("In the case of *Seibert*, the only thing we know for sure is that at least seven members of the Court rejected an intent-based approach and accepted some kind of exception to *Elstad*, even if the scope of that exception remains unclear.");[15] *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) ("[A]rguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court.").

Disagreement among the Circuits on a given issue "may be indicative of a lack of clarity in the Supreme Court's jurisprudence." *See Hall v. Zenk*, 692 F.3d 793, 799 (7th Cir. 2012). But

---

[14]    Despite this statement in *Widi*, there is First Circuit authority supporting the position that Justice Kennedy's concurrence is controlling. In *United States v. Rogers*, 659 F.3d 74 (1st Cir. 2011) (Souter, J.), Retired Associate Justice Souter, siting by designation, identified Justice Kennedy's concurrence as the "controlling opinion" in *Seibert* and analyzed the defendant's interrogation under that standard.

[15]    Prior to *Heron*, however, the Seventh Circuit had indicated that Justice Kennedy's concurrence is controlling. *See United States v. Peterson*, 414 F.3d 825, 828 (7th Cir. 2005) ("[*Seibert*] holds that post-warning statements are inadmissible if they duplicate pre-warning statements intentionally elicited in an effort to evade *Miranda*.").

such disagreement does not necessarily mean that there is an absence of clearly established federal law on that issue. *See Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263 (3d Cir. 2016) (en banc) (holding that it was clearly established federal law that inadmissible evidence could be the basis for a *Brady*[16] violation, despite the fact that a minority of Circuit courts had held that only admissible evidence could be the basis for such a violation);[17] *see also Williams v. Bitner*, 455 F.3d 186, 193 (3d Cir. 2006) (stating, in the context of a qualified immunity analysis, that "[e]ven if our sister circuits had in fact split on the issue, we would not necessarily be prevented from finding that the right was clearly established"); *but see Garrus v. Sec'y of Pennsylvania Dep't of Corr.*, 694 F.3d 394, 416 (3d Cir. 2012) (Hardiman, J., dissenting) ("The existence of a circuit split demonstrates that it is wrong to conclude that fairminded jurists could not disagree on the correctness of the state court's decision in this case." (internal quotation marks and alterations omitted)); *see generally* Ruth A. Moyer, *Disagreement About Disagreement: The Effect of A Circuit Split or "Other Circuit"Authority on the Availability of Federal Habeas Relief for State Convicts*, 82 U. Cin. L. Rev. 831, 847 (2014). Ultimately, however, the Court agrees with the Magistrate Judge that it need not resolve the question of whether Justice Kennedy's concurrence is "clearly established Federal law" because, even under Justice Kennedy's standard, Charleston's formal statement was admissible.

As set forth above, the threshold question in Justice Kennedy's test is whether a "deliberate two-step strategy has been used" or, in other words, if "the two-step interrogation

---

[16]     *Brady v. Maryland*, 373 U.S. 83 (1963).

[17]     Commenting on the significance of circuit splits in this context, the court in *Dennis* observed that "[a]lthough the United States Supreme Court recently recognized that circuit splits may indicate a possibility of fairminded disagreement under AEDPA, it did so where the circuit split emerged out of an express reservation left by the Supreme Court on the precise question decided by the state court." *Id.* at 310 n.27. But, the court observed, the Supreme Court had "made no such express reservations when it comes to *Brady* materiality or an admissibility requirement." *Id.*

technique was used in a calculated way to undermine the *Miranda* warning."[18]  In applying

Justice Kennedy's test, courts have "review[ed] the totality of the objective and subjective

evidence surrounding the interrogations in order to determine deliberateness." *United States v.*

*Capers*, 627 F.3d 470, 479 (2d Cir. 2010); *see United States v. Shaird*, 463 F. App'x 121, 124

(3d Cir. 2012) (considering "the surrounding circumstances and [the officer's] testimony of his

own actions and motivation" to determine deliberateness).[19] Where credible subjective evidence

of the officer's intent is available, it will "of course be persuasive, and often decisive." *See*

*United States v. Moore*, 670 F.3d 222, 230 n.3 (2d Cir. 2012); *Shaird*, 463 F. App'x at 124

("Critically, [the officer] testified that his [pre-warning] conversation with the [defendant] was a

deliberate strategy to elicit a confession"). But because such evidence often will be unavailable,

"in most instances, the inquiry will rely heavily, if not entirely, upon objective evidence."

*Capers*, 627 F.3d at 479 (2d Cir. 2010). In seeking guidelines for how to assess "objective

evidence" in this context, courts have turned to the five factors articulated by the *Seibert*

plurality, namely:

---

[18]     As the Magistrate Judge noted, because the state courts did not consider Charleston's claim under Justice Kennedy's analysis, this Court must apply de novo review to this limited portion of the claim. *See* R&R 22 n.17 (citing *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (holding that the de novo standard applies when state court did not reach merits); *Everett v. Beard*, 290 F.3d 500, 507-08 (3d Cir. 2002) (appling de novo review when state courts failed utilize correct legal standard)).

[19]     As courts applying this standard have observed, Justice Kennedy "did not articulate how a court should determine whether an interrogator used a deliberate two-step strategy." *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006). "For example, Justice Kennedy's opinion is silent as to what, if any, presumptions apply or which party bears the burden of proving or disproving deliberateness." *Id.* at 1159 n.11; *see Capers*, 627 F.3d at 477 ("In *Seibert*, because the record was clear that the interrogating officers intentionally and purposefully employed a technique in which they had been instructed . . . Justice Kennedy had no reason to explore how a court should determine when a two-step interrogation strategy had been executed deliberately.").

[1] the completeness and detail of the questions and answers in the first round of interrogation[;]
[2] the overlapping content of the two statements[;]
[3] the timing and setting of the first and the second [interrogations;]
[4] the continuity of police personnel[;] and
[5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 615 (plurality). Although these factors "were developed by the [*Seibert*] plurality to gauge whether the later *Miranda* warnings 'could be effective enough to accomplish their object,'" courts have found that they "likewise will often serve as helpful indicia for whether an alleged two-step interrogation was intended to circumvent *Miranda*." *See Moore*, 670 F.3d at 230.[20]

A review of the evidence in this case leads the Court to conclude that Respondents have shown by a preponderance of the evidence that the detectives did not engage in a deliberate two-step strategy to deprive Charleston of his *Miranda* rights. The Court begins by observing that the record lacks any subjective evidence of Detective Singleton's intent. As set forth above, Detective Singleton testified that, prior to administering the *Miranda* warnings, he asked Charleston "about the circumstances surrounding the murder of William Stanton," in response to which Charleston "explained in some detail what occurred in the house," and that "at some point" thereafter the detective provided the *Miranda* warnings to Charleston. But Detective Singleton did not testify as to *why* he did not provide the *Miranda* warnings before asking Charleston about the circumstances of Stanton's murder, nor did he testify as to why he chose to administer the warnings when he did.

---

[20]    These factors are not exhaustive, however, nor are they to be applied in a mechanical fashion to each and every case, as such an approach would seem to undermine Justice Kennedy's concern that applying "a multifactor test . . . to every two-stage interrogation" may serve to undermine the clarity of *Miranda*. *See Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).

Turning to the objective evidence, the first *Seibert* factor considers the "completeness and detail of the questions and answers in the first round of interrogation." In particular, courts have found that where the pre-warning questioning is "systematic, exhaustive, and managed with psychological skill," as in *Seibert*, it is more likely that the omission of the *Miranda* warnings was deliberate. *See United States v. Aguilar*, 384 F.3d 520, 525 (8th Cir. 2004) (concluding that, under *Seibert*, "the *Miranda* warnings between the two questioning sessions did not serve the purpose of the dictates in *Miranda*," where, *inter alia*, "the first questioning session consisted of more than routine booking questions, included some good cop/bad cop questioning tactics, and lasted approximately ninety minutes"). Conversely, when an interrogation is brief, it is more likely that the omission of *Miranda* warning was not deliberate. *See United States v. Williams*, 681 F.3d 35, 44 (2d Cir. 2012) (determining that omission of *Miranda* warnings was not deliberate when, among other factors, the initial questioning was "brief and spare"); *United States v. Materas*, 483 F.3d 27, 33 (1st Cir. 2007) (determining that omission of *Miranda* warnings was not deliberate where, among other factors, "the first questioning was not at all systematic or extensive" (internal quotation marks omitted)); *United States v. Street*, 472 F.3d 1298, 1314 (11th Cir. 2006) (determining that the omission was not deliberate where, among other factors, the pre-warning questioning was "brief and general"); *but see United States v. Young*, No. 15-50158, 2017 WL 6603511, at *2 (9th Cir. Dec. 27, 2017) (finding detectives deliberately engaged in a two-step interrogation where, among other things, they interrogated the defendant "at the police station for at least twenty minutes without providing any *Miranda* warnings"). Similarly, where the pre-warning questioning is non-confrontational, it is more likely that the omission of *Miranda* warnings was not deliberate. *See United States v. Nunez-Sanchez*, 478 F.3d 663, 668–69 (5th Cir. 2007) (determining that there was "no evidence of a

deliberate attempt to employ a two-step strategy" when"[a]ll evidence suggests that [the suspect] was calm and cooperative, and the agents did not act with aggressiveness or hostility" during brief pre-warning questioning).

Here, Detective Singleton testified that he administered the *Miranda* warnings about twenty minutes after he entered the interview room that morning. Within that twenty-minute period, Detective Singleton gave Charleston water and a cheese sandwich, asked Charleston a series of biographical questions, and then asked Charleston about his involvement in the shooting. Moreover, within this brief span of time, there is no evidence that Detective Singleton's questioning of Charleston was in any respect systematic or "managed with psychological skill." Rather, according to Detective Singleton's testimony, he simply "asked [Charleston] about the circumstances surrounding the murder of William Stanton," and Charleston, in response, "seemed eager to tell his portion of the story" and "explained in some detail what happened in the house." Likewise, as indicated above, the trial judge found that there was no evidence of coercion before or during the questioning. The brief and non-confrontational pre-warning questioning in this case, then, is in sharp contrast with the intensive and extended pre-warning interview in *Seibert*, a factor that weighs in favor of finding that Detective Singleton's omission of the *Miranda* warnings was not deliberate.

The fifth *Seibert* factor— concerning the degree to which the interrogator's questions treated the second round as continuous with the first—also weighs in favor of a finding of non-deliberateness in this case. In *Seibert*, as Justice Kennedy observed, the officer's intent to subvert *Miranda* was evidenced by the fact that the post-warning questioning "resembled a cross-examination" in which the officer "confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them." *See Seibert*, 542 U.S. at 621 (Kennedy, J.,

concurring); *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1136 (11th Cir. 2006) ("Thus the type of two-step questioning that falls within Justice Kennedy's narrow concurrence is the type used in *Seibert*, where officers in a calculated manner first obtained unwarned incriminating statements from a suspect, *and then used those incriminating statements in the warned interrogation* in order to undermine the midstream *Miranda* warnings." (emphasis added)). Here, by contrast, Detective Singleton's post-warning questions were open-ended in nature; the detective did not pressure Charleston to conform his answers to his earlier statement, nor did the detective even refer back to that statement.

In addition to the first and fifth *Seibert* factors, there are other considerations weighing in favor of a finding of non-deliberateness in this case. As Respondents point out, Detective Singleton had declined to interview Charleston the previous night because he believed Charleston was not sober. Arguably, if Detective Singleton had been intent on subverting *Miranda*, he would have seized the opportunity to question Charleston when his judgment was possibly impaired. Further, as detailed above, on the night Charleston was taken into custody he told Officer Soliman that he knew nothing about the Stanton killing. Although the record does not reflect whether Detective Singleton and Officer Soliman discussed Charleston's answer, it is a fair assumption that they had done so, given that they worked together on the evening that Charleston was brought to the station. Accordingly, Detective Singleton might well have expected that Charleston, in response to a neutrally-worded question about "the circumstances surrounding the murder of William Stanton," would continue to claim that he knew nothing about the incident.

On the other hand, several of the *Seibert* factors weigh in the opposite direction. In particular, under the third and fourth *Seibert* factors, the two interrogations occurred at the same

place and time and the same police personnel were present at each interrogation, considerations that weigh in favor of a finding of deliberateness.[21] On balance, however, the Court finds that there is a preponderance of evidence that Detective Singleton's initial omission of *Miranda* warnings was not a deliberate attempt to subvert *Miranda*. Particularly in view of the brief and non-confrontational nature of the initial questioning and the open-ended and similarly non-confrontational nature of the second questioning, the Court finds the detective's initial failure to read Charleston his *Miranda* rights, "though unfortunate and unexplained, seems much more likely to have been a simple failure to administer the warnings rather than an intentional withholding that was part of a larger, nefarious plot." *See Reinert v. Larkins*, 379 F.3d 76, 91 (3d Cir. 2004). Accordingly, the two-step interrogation in this case does not present the Court with "the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning."[22]

Finally, the Court finds that even if Charleston's statement was erroneously admitted, the admission did not have "[a] substantial and injurious effect or influence in determining the jury's

---

[21]    With respect to the second *Seibert* factor—concerning the overlapping content of the two statements—there is limited information in the record concerning the details of Charleston's initial statement, but it appears that the content of that statement was similar to the second statement. *See* Suppr. N.T. at 74-76. In any event, because this factor focuses on the response of the defendant, rather than the conduct of the officer, it appears to be of limited utility with respect to discerning the officer's state of mind, which is the focus of the present inquiry.

[22]    As indicated above, Charleston argues that the burden should be on the Government to show that the initial omission of the *Miranda* warnings was not intentional. But although a number of courts have held that the burden in these circumstances rests with the Government, it cannot be said that there exists "clearly established Federal law" on this matter. *See United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010) (observing that the question "of which party bears the burden of proving deliberateness or absence thereof" is "unsettled," but agreeing with the Eighth Circuit that the burden rests on the prosecution to disprove deliberateness (citing *United States v. Ollie*, 442 F.3d 1135, 1142 (8th Cir. 2006)). In any event, even if it were clearly established that the Government bears the burden on this issue, there is a preponderance of evidence in this case that the omission of the *Miranda* warnings was not deliberate.

verdict," under the standard set for by *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under

this test, the court may grant relief only if it has a "grave doubt" as to whether the error at trial

had a substantial and injurious effect or influence. *See Johnson v. Lamas*, 850 F.3d 119, 133 (3d

Cir. 2017). In other words, "[t]here must be more than a 'reasonable probability' that the error

was harmful." *Id.* (quoting *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015)). The court's role is to

ask whether the constitutional error "substantially influenced the jury's decision." *See Adamson

v. Cathel*, 633 F.3d 248, 25960 (3d Cir. 2011) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436

(1995)). "If, when all is said and done, the [court's] conviction is sure that the error did not

influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.*

(quoting *O'Neal,* 513 U.S. at 437). "The Supreme Court has cautioned that 'the uncertain judge

should treat the error, not as if it were harmless, but as if it affected the verdict.'" *Id.* (quoting

*O'Neal*, 513 U.S. at 435).

     As indicated above, Respondents contend that the admission of Charleston's statement

did not cause *Brecht* prejudice in this case. This is because, in their view, Charleston's statement

was not a "confession" but rather was a "substantially exculpatory explanation of events,"

Charleston "freely admitted at trial that he shot the victim (or at least that the gun discharged

while he struggled for control of it)," and the evidence that Charleston murdered Stanton "would

have been overwhelming even in the absence of his statement to police and testimony." Resp.

28-29, ECF No. 18.

     Charleston, on the other hand, contends that the admission of the statement did cause

*Brecht* prejudice in view of the fact that the statement was read to the jury, and that the

prosecutor, in her closing argument, "argued that [Charleston] had drastically changed his story"

at trial:

The prosecutor pointed out that in the Petitioner's statement to the police, he had told Detective Singleton that both of the parties had their hands on the firearm while all three shots were fired; however, after hearing the ballistician testify that the firearm would have jammed in that scenario, the Petitioner testified at the trial that his hand was on the victim's arm and not on the firearm. Additionally, the prosecutor argued that in the police interview, the Petitioner had said that he had told his mother about self-defense, yet at trial, the Petitioner testified that he had not so informed his mother.

Pet'r's Objections 12.

The Court finds that, in light of the evidence presented at trial, the admission of Charleston's statement did not have a substantial and injurious effect or influence in determining the jury's verdict under *Brecht*. Charleston is correct that the prosecutor, in her closing argument, pointed out several inconsistencies between Charleston's statement and his trial testimony. But this was by no means the focus of the prosecutor's argument, nor was this the only evidence that served to undermine Charleston's credibility. Rather, there was a wide range of evidence pointing to Charleston's guilt and undermining his credibility.

Above all, the prosecutor showed that the account of the shooting that Charleston presented in his testimony at trial[23] was not believable in light of common sense and the other

---

[23] Charleston does not contend that his trial testimony was compelled by the admission of his statement. *See Sierra v. Bartowski*, No. CIV.A. 11-1860 RMB, 2012 WL 4504246, at *11 (D.N.J. Sept. 27, 2012) (finding that the petitioner did not show that the admission of his confession caused prejudice under *Brecht* when, among other factors, "at no point did Petitioner assert that he would not have testified at trial had he had his confession deemed inadmissible or that his testimony could have been substantively different from the one he gave during the trial"). Moreover, in view of the evidence that Charleston had shot Stanton, "a self-defense theory was the only recourse available" to Charleston to justify the shooting, and it is more likely than not that he would have testified even if his statement had not been admitted. *See Burks v. Perini*, 810 F.2d 199 (6th Cir. 1986) (concluding that the government's use of the defendant's involuntary statement did not induce him to testify on his own behalf when a self-defense theory was the only recourse available to the defendant).

evidence presented at trial. As in his statement to Detective Singleton, Charleston testified at trial that on the day of the shooting, after he and Stanton had entered the home at 2428 North 25th Street to conduct a purchase of Xanax pills, they got into an argument about the pills and Stanton pulled out a gun, which Charleston attempted to wrestle away from him. *See* Trial N.T., Aug. 24, at 33-41, 52-110. Charleston testified that during the struggle over the gun, his hands were on Stanton's wrists and forearm. *Id.* at 48, 101-110. (As indicated above, this differed from his statement, where he indicated that both of their hands were on the gun.) Charleston further testified that the gun fired several times and Stanton fell to the ground, facedown. *Id.* at 42-43, 109-119. As Stanton was lying on his stomach, Charleston asked Stanton if he was ok, but Stanton did not respond, and Charleston was not sure if Stanton had been shot. *Id.* at 112-118. After Stanton failed to respond to him, Charleston took the gun out of Stanton's hand, exited the home with the gun concealed under his shirt, and then threw the gun into a sewer. *Id.* at 44, 120-124. He testified that he threw the gun in a sewer because he was concerned that one of the neighborhood children might come across it if he left it in the house. *Id.* at 122-123.

As the prosecutor contended in her closing argument, common sense and the evidence presented at trial contradicted every aspect of this story. First, with respect to the shooting itself, forensic evidence showed that Stanton had been shot three times, in the chest, lower abdomen, and right thigh, and that the gunshot to his chest was fired from two to six inches away and traveled horizontally straight through Stanton's heart and lungs. *See* N.T., Aug. 21, at 62-114. The evidence also showed that the gun from which the shots were fired requires that the trigger must be pulled for each shot fired, with a force of six to seven pounds. Trial N.T., Aug. 21, at 124-30. Given these facts, it is nearly impossible to imagine that the shooting occurred as Charleston testified that it did. That is, it is not credible that Charleston, who was smaller than

Stanton, controlled Stanton's forearm and wrist in such a way that he caused Stanton to shoot himself three times—including one shot straight through the chest, from two to six inches away—applying six to seven pounds of pressure on the trigger each time. In short, as the prosecutor argued, Charleston's testimony that Stanton "shoots himself and then continues to shoot himself" does not make sense. *See* Trial N.T., Aug. 24, at 176.

Charleston's testimony concerning his conduct after the shooting is similarly incredible. As the prosecutor emphasized in her closing argument, the notion that Charleston did not realize that Stanton had been shot when, by Charleston's own account, Stanton was lying on the ground in an unresponsive state, is not believable. Moreover, according to Charleston's testimony, Stanton was his friend. But, as the prosecutor pointed out, after the shooting, Charleston made no effort to call 911 or otherwise seek help. Likewise, Charleston's account of his decision to dispose of the gun also makes little sense when, if Charleston's testimony about the circumstances of the shooting were true, the gun would have had only Stanton's fingerprints on it, which would have been powerful evidence in support of Charleston's account. Finally, the jury heard evidence that Stanton's body was found with only a set of keys, a cell phone, and $3 on his person. *See* Trial N.T., Aug. 20, at 96. But according to Stanton's mother, Stanton had over $500 on him earlier in the day, and Charleston testified that Stanton had Xanax pills. As the prosecutor argued, the fact that Stanton was found without the money and pills supports the prosecution's theory that Charleston robbed Stanton.

The jury also heard testimony that, in the hours after the shooting, Charleston denied to several persons that he had been at 2428 North 25th Street or that he knew what had happened to

Stanton. *See* Trial N.T., Aug. 19, at 88-89, 168-70. [24] In particular, Stanton's mother testified that

on the afternoon of the shooting, after trying unsuccessfully to reach her son by phone, she saw

Charleston walk by her house, coming from the direction of 2428 North 25th Street. Trial N.T.,

Aug. 21, at 48-61. She asked Charleston if he had seen her son, as the two were good friends and

she considered Charleston to be like a son to her. *Id.* at 48-52, 60-61. Charleston replied "no"

and kept walking. *Id.* at 48-52.

In short, even in the absence of Charleston's statement, there was overwhelming evidence

of Charleston's guilt and lack of credibility, and the prosecutor drew upon all of this evidence in

making her closing argument. In particular, the prosecutor closely examined the account of the

shooting that Charleston presented in his testimony and showed that even if one takes that

account on its own terms—setting aside its contradictions with Charleston's statement—it is not

believable. Accordingly, the Court finds that the admission of Charleston's statement did not

have a substantial and injurious effect or influence in determining the jury's verdict under

*Brecht*. Even without Charleston's statement, there was overwhelming evidence that Charleston

murdered Stanton. Charleston's first objection is overruled.

**B.      Objection Two, concerning the admission of tattoo evidence, is overruled.**

Charleston's second objection concerns his claim that his due process rights were

violated by the admission of evidence that he had a tattoo of the words "By any means necessary,

f--- it, s--- happens." He contends that the admission of this evidence deprived him of a

---

[24]      Charleston's presence at 2428 North 25th Street at the time of the shooting was
established not only by his own testimony but also by a witness who, on the day of the shooting,
shortly after hearing gunshots in the area, saw Charleston exit the house breathing heavily and
then jog away. *See* Trial N.T., Aug. 19, at 73-86.

fundamentally fair trial because the prosecutor used this evidence to improperly launch an attack on his character.[25]

The Magistrate Judge determined that Charleston procedurally defaulted on this claim because he failed to present this claim to the state courts. Rather, at the state level, Charleston challenged the admission of the tattoo evidence as being an error only in state evidentiary rulings, not a federal due process violation. The Magistrate Judge acknowledged that Charleston's brief in support of his direct appeal at the state level cited a federal case, namely, *Boliek v. Delo*, 912 F. Supp. 1199 (W.D. Mo. 1995), but the Magistrate Judge determined that Charleston's citation to *Boliek*, by itself, did not serve to notify the state courts that he was challenging the admission of the tattoo evidence on due process grounds. This is because the relevant finding in *Boliek* was that counsel's failure to object to the admission of irrelevant tattoo evidence violated the defendant's right to effective assistance of counsel, not that the admission of such evidence violated the defendant's due process rights.[26]

Charleston objects that the *Boliek* opinion "went beyond the question of effective assistance of counsel in order to determine whether or not the underlying claim of the [defendant's] had arguable merit." Pet'r's Objections 17. But the *Boliek* opinion was clear that the issue on which it was ruling was the ineffectiveness of counsel: "This Court finds that trial counsel was ineffective. His performance and the prejudice petitioner suffered as a result of his

_____

[25]    On direct appeal, the Superior Court held that evidence of Charleston's tattoo was appropriately offered to rebut testimony offered by Charleston concerning his good character—namely, Charleston's testimony that he had an aversion to firearms and that, following the shooting, he removed the firearm from the house and dumped it in the sewer out of concern for public safety. *See Charleston*, 16 A.3d at 528–29.

[26]    As the Magistrate Judge noted, it appears from the *Boliek* opinion that the defendant in that case presented both ineffective assistance of counsel and due process claims concerning his tattoo, but the *Boliek* court ultimately analyzed only the ineffective assistance of counsel claim. *See Boliek*, 912 F. Supp. at 1212.

performance undermine this Court's confidence in the outcome of the trial and of the penalty phase." *Boliek*, 912 F. Supp. at 1214. The *Boliek* court made no determination as to whether admission of the tattoo evidence violated the defendant's due process rights. Accordingly, Charleston's citation to *Boliek* alone did not alert the state court that he was challenging the tattoo evidence on due process grounds, and Charleston's objection on this point is overruled.[27]

## C. Objections Three through Five, concerning the ineffective assistance of counsel, are overruled.

Charleston's final three objections concern claims of ineffective assistance of counsel.

### i. Objection Three, concerning counsel's failure to object to the trial court's limiting instruction for Clara Stanton's testimony, is overruled in part.

Charleston's first ineffectiveness of counsel objection concerns trial counsel's failure to object to a limiting instruction the trial court gave concerning the testimony of Clara Stanton, the mother of the victim.

During the trial, the prosecution called to the stand a witness named Nashua Sanders, a friend of Charleston and an acquaintance of the victim and the victim's mother, Clara Stanton. The prosecutor asked Ms. Sanders whether she had told Ms. Stanton that she (Sanders) had a conversation with Charleston in which Charleston stated that he planned to rob the victim. Trial N.T., Aug. 20, at 36. Sanders denied that she said this to Ms. Stanton, and she also denied that Charleston had ever told her such a thing. *Id.*

Following Nashua Sanders's testimony, the prosecutor called Ms. Stanton as a witness. When the prosecutor began to ask Ms. Stanton about whether she had a conversation with Nashua Sanders about what had happened to her son, defense counsel objected and a sidebar

---

[27] As the Magistrate Judge observed, a procedural default may be excused if Charleston can show cause and prejudice or that a failure to consider the claim result in a fundamental miscarriage of justice, but here Charleston has not presented any grounds to excuse the default.

discussion was held concerning whether Ms. Stanton could testify about what Ms. Sanders had purportedly said to her. *Id.* at 63. The trial judge deferred issuing a definitive ruling on the matter and later that same afternoon heard further argument from the parties. The prosecutor argued that Ms. Stanton's testimony would be admissible under Pennsylvania Rule of Evidence 613(b), which permits the admission of extrinsic evidence of a witness's prior inconsistent statement under certain circumstances. *See id.* at 103. The prosecutor argued that this testimony was "classic impeachment," i.e., she would be impeaching Nashua Sanders by providing evidence of a prior inconsistent statement that she made to Ms. Sanders. *Id.* at 105. The trial court ruled that the testimony was admissible as extrinsic evidence of a prior inconsistent statement, but advised the attorneys that because the statement was hearsay, he would "give a limiting instruction because just [sic] the statement was said does not mean it's true." *Id.* at 108. The prosecutor then stated that she was not "asking for it to come in substantively. It's for impeachment purposes," *id.* at 108, to which the trial court responded, "I'll allow it under that limited circumstances and I'll give a limited instruction." *Id.* at 109. Defense counsel stated, "Yes, your Honor." *Id.*

Ms. Stanton was then recalled to the stand, where she testified that about three weeks after her son's death, Ms. Sanders told her about a conversation that she (Sanders) had with Charleston about a week before the shooting, in which Charleston said that he planned to rob the victim. *Id.* at 111-12. Following Ms. Stanton's testimony, the trial court gave the following limiting instruction:

> Ladies and gentlemen, with regard to the testimony that you just heard, I'm just going to give you an instruction and that evidence is not necessarily to be accepted for the truth of the statements made by Ms. Sanders to Ms. Stanton, okay. It doesn't — they were statements and you will be given additional instructions at the appropriate time.

*Id.* at 116. There were no objections made to this instruction. No further instruction regarding this testimony was included in the closing instructions.

The parties agree that Ms. Stanton's testimony was admissible solely for the purpose of impeaching Ms. Sanders under Pennsylvania Rule of Evidence 613. Charleston contends that the trial court's instruction that Ms. Stanton's statements were "not necessarily" to be accepted for the truth of the matter asserted was erroneous and prejudicial, and that trial counsel's failure to request a proper instruction deprived him of the effective assistance of counsel.

In its review of Charleston's appeal under Pennsylvania's Post-Conviction Relief Act (PCRA), the Superior Court determined that Charleston had waived this claim for two reasons. *See Com. v. Charleston*, 94 A.3d 1012, 1021 (Pa. Super. Ct. 2014). First, the Superior Court determined that Charleston had failed to adequately develop an argument under *Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987), which requires that, in order to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result. The Superior Court determined that Charleston's briefing (1) "fail[ed] to develop an argument or present **pertinent** authority that the court's use of the colloquial expression 'not necessarily' rendered its instruction fatally equivocal"; (2) "fail[ed] to develop an argument that counsel had no reasonable basis not to request an additional instruction,"; and (3) failed to develop an argument that there exists a "a reasonable probability that, but for counsel's alleged unprofessional error in not requesting a second instruction, the result of the proceedings would have been different." *Charleston*, 94 A.3d at 1021. Second, the Superior Court indicated that

Charleston waived this claim under Pennsylvania Rule of Appellate Procedure 2119(a).[28] This is because Charleston "merely assume[d] that the statement at issue was introduced by the Commonwealth as substantive evidence of [his] intent to commit 'murder and robbery,' rather than as evidence of an inconsistent statement" and because he merely "relie[d] on a lengthy quotation from the prosecutor's closing argument" in support of this claim. *Id.* at 1022.

In addition to its waiver analysis, the Superior Court also determined that Charleston's "challenge to the jury instruction which the trial court actually gave does not have merit," in view of the broad discretion that trial courts have in phrasing their instructions under Pennsylvania law. *Id.* at 1021. Moreover, the court found that "trial counsel had an obvious reasonable basis not to seek an additional instruction, which would have necessarily reminded the jury of the underlying statement that [Charleston] planned to rob the victim." *Id.* Accordingly, the court concluded that Charleston's claim "is waived and would not merit relief." *Id.*

In reviewing this claim as presented in Charleston's habeas corpus Petition, the Magistrate Judge initially considered the question of whether the Court has an independent duty to review the Superior Court's determination that Charleston waived this claim under Pennsylvania law. As the Magistrate Judge observed, several courts in this Circuit have

---

[28]     Pennsylvania Rule of Appellate Procedure 2119(a) requires that arguments "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Pa. R.A.P. 2119(a). Pennsylvania courts have held that, under this Rule, the failure to develop an adequate argument in an appellate brief may result in waiver of the claim. *See Com. v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. Ct. 2007); *see also Vaughter v. Fisher*, No. CIV.A. 12-00493, 2014 WL 1152540, at *9 (E.D. Pa. Mar. 24, 2014) ("The Pennsylvania waiver doctrine is, essentially, an appellate pleading standard requiring that a party set forth authority and factual details of a claim in a manner allowing for meaningful review. . . . Meeting this standard has been recognized by the Third Circuit to constitute a procedural requirement.").

determined that the question of whether a habeas corpus petitioner complied with state appellate rules "is a matter of state law, beyond [the federal court's] review." *See Klein v. Kelchner*, No. CIV.A. 02-8451, 2003 WL 22204561, at *3 (E.D. Pa. Sept. 4, 2003); *see also Leake v. Dillman*, 594 F. App'x 756, 759 (3d Cir. 2014) ("[E]ven if the Superior Court incorrectly deemed waived certain of Petitioner's ineffective assistance claims . . . habeas relief would not be warranted, as it is 'well established that a state court's misapplication of its own law does not generally raise a constitutional claim.'" (quoting *Taylor v. Horn*, 504 F.3d 416, 448 (3d Cir. 2007))). Nevertheless, relying on *Rolan v. Coleman*, 680 F.3d 311 (3d Cir. 2012), the Magistrate Judge determined that the Court has a duty to independently review the Superior Court's analysis of the waiver issue. R&R at 21.[29]

Applying that analysis, the Magistrate Judge reached the same conclusion as the Superior Court, namely that Charleston waived this claim by failing to adequately develop his *Pierce* argument in his state court briefing. Specifically, the Magistrate Judge determined that Charleston failed to adequately present an argument that he had suffered actual prejudice, as his sole argument on this point in his state court briefing was that "[s]ince intent was the key issue for the jury to resolve, he was surely prejudiced." R&R at 53 (quoting Appellant's Brief at 12-13). Because Charleston "offered no argument or pertinent caselaw to establish that the admission of such hearsay evidence regarding motive could result in a different result," the

---

[29]     In *Rolan*, the Pennsylvania Superior Court had determined that the habeas corpus petitioner waived certain claims when he failed to comply with Rules 1925(d) and 2119(a) of the Pennsylvania Rules of Appellate Procedure. 680 F.3d at 319. The federal district court adopted the Superior Court's rationale, but the Third Circuit Court of Appeals disagreed, holding that the petitioner had shown "substantial compliance" with these rules and that the Superior Court's finding of waiver should not preclude the federal court's consideration of the petitioner's claims. *Id.*

Magistrate Judge concluded that he failed to substantially comply with Pennsylvania's appellate rules. R&R at 35-36.[30]

Charleston objects that his PCRA briefing did, in fact, fairly present his argument on this issue. In particular, he directs this Court's attention to the dissenting opinion of the Honorable Judith Olson of the Superior Court, who disagreed with the conclusion of Superior Court majority's opinion that Charleston had waived this issue.

Reviewing this issue de novo, first, with respect to the waiver issue, the Court agrees with the Magistrate Judge that, in light of the Third Circuit's opinion in *Rolan*, the Court has a responsibility to independently review the Superior Court's determination that Charleston waived this claim. Having reviewed Charleston's PCRA briefing, the Court finds that although Charleston's argument on this issue was somewhat lacking in legal citations and analysis, his argument was sufficiently clear to avoid waiver of the claim. As Judge Olson observed, Charleston's brief "devoted over 1600 words, filling six and one-half pages, of his argument section to addressing this single issue," providing thirteen citations to trial testimony and four case citations. *Charleston*, 94 A.3d at 1029 (Olson, J., concurring and dissenting). In particular, with respect to the prejudice element of his claim, Charleston's argument that "intent was the key issue to resolve" was sufficiently clear where it was evident that one of the issues in this case was whether (as Charleston testified) the shooting occurred as the result of a struggle over

---

[30]     In the alternative, the Magistrate Judge determined that even if Charleston's counsel "lacked a strategic reason to not request another instruction, Charleston cannot establish that there is a reasonable probability that there would have been a different result had counsel done so," in view of the ballistics evidence and testimony from the medical examiner that contradicted Charleston's testimony about the circumstances of the shooting. R&R at 36 n.24. Further, the Magistrate Judge determined that Charleston's defense "was undermined by his initial denial of any knowledge of the incident . . . and his failure to seek help for the victim after the shooting, maintaining that he did not know Mr. Stanton had been shot, despite the fact that he was lying motionless and unresponsive on the floor." *Id.*

Stanton's gun or whether (as the prosecutor argued) the shooting occurred as the result of Charleston's attempt to obtain Stanton's Xanax and money.

Second, with respect to the merits of Charleston's claim, this Court must defer to the Superior Court's determination that Charleston's "challenge to the jury instruction which the trial court actually gave does not have merit" under Pennsylvania law. *See Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004) (holding that the federal court is "[b]ound by the state court's determination that the instruction at issue comported with state law").

Moreover, even if the jury instruction was erroneous,[31] the Court is unable to say that the state court's application of the *Strickland*[32] standard was unreasonable. *See Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) ("When a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, '[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable,' which 'is different from asking whether defense counsel's performance fell below *Strickland's* standard.'" (quoting *Harrington v. Richter*, 562 U.S. 86, 88 (2011))). The Superior Court's conclusion that trial counsel may have

---

[31]    In her dissenting opinion, Judge Olson concluded that "a reasonable reading of the limiting instruction requires an acknowledgment that the instruction was equivocal." *Charleston*, 94 A.3d at 1031 (Olson, J., concurring and dissenting). Accordingly, "[i]f the jury followed the trial court's instruction with respect to Clara Stanton's testimony, it could have considered the hearsay portion of her testimony as proof of the truth of the matter asserted since the trial court's instruction did not foreclose this approach," a result that "would defeat the fundamental purpose of the limiting instruction." *Id.* at 1033.

[32]    *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. Here, the Superior Court applied the standard set forth in the Pennsylvania case of *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987), which is equivalent to the *Strickland* standard. *See Boyd v. Waymart*, 579 F.3d 330, 334 n.2 (3d Cir. 2009) ("The Pennsylvania Supreme Court has made clear that the standard for ineffective assistance of counsel under Pennsylvania law . . . is the same as *Strickland's* standard . . . so a Pennsylvania court has adjudicated a *Strickland* claim on the merits where it has applied the state-law standard to that claim.").

made a calculated decision not to request a revised instruction, in an attempt not to highlight the testimony, is not unreasonable.

Accordingly, the Court defers to the Superior Court's decision that the instruction was not contrary to Pennsylvania law and, in any event, finds that the state court's application of the *Strickland* standard was not unreasonable. [33] Charleston's objection is therefore overruled in part.

### ii.     Objection Four, concerning counsel's failure to object to the trial court's statement concerning evidence that Charleston's "reputation for telling the truth is bad," is overruled.

Charleston's second ineffectiveness of counsel objection, and fourth objection overall, concerns his trial counsel's failure to object to the trial court's statement that Charleston's "reputation for telling the truth is bad." On this issue, Charleston's Statement of Objections simply repeats the arguments presented in his earlier Memorandum in Support of his Petition and does not specify which aspects of the R&R's analysis, if any, he objects to.

During the trial, the prosecution read a stipulation to the jury that Charleston had three prior convictions—namely, that he had been found guilty of theft on September 1, 2004, of unauthorized use of an automobile on December 17, 2004, and of theft on July 26, 2005. Trial N.T., Aug. 24, at 146. Then, in the closing instructions, the judge stated the following:

> The defendant took the stand as a witness. In considering the defendant's testimony [, y]ou are to follow the general instructions I gave you for judging the credibility of witnesses. You should not disbelieve the defendant's testimony merely because he is the defendant.
>
> There was evidence tending to prove that the defendant has prior criminal convictions. And I'm speaking of the record introduced by the Commonwealth by stipulation. *The assistant district attorney introduced evidence tending to show that the defendant's reputation for telling the truth is bad.*
>
> This evidence is not evidence of the defendant's guilt. You must not infer guilt from the evidence of prior convictions. This evidence may be considered by you

---

[33]     The Court also agrees with the Magistrate Judge's determination that even if Charleston's counsel had requested another instruction, Charleston cannot establish that there is a reasonable probability that there would have been a different result.

for one purpose only, that is, to help you judge the credibility and weight of the testimony given by the defendant as a witness in this trial.

In considering the evidence of prior convictions, you may consider the types of crimes committed, how long ago they were committed, and how it may affect the likelihood that the defendant has testified truthfully in this case.

*Id.* at 226-27 (emphasis added).

In his Petition, Charleston contends that the trial judge conflated *crimen falsi* evidence and credibility evidence, and that there was, in fact, no evidence presented at trial that his "reputation for telling the truth is bad." He claims that his counsel's failure to object to the judge's instruction on this point deprived him of the effective assistance of counsel.

Applying the *Strickland* standard, the Magistrate Judge determined that counsel's failure to object was not objectively unreasonable in the context of the case. As the Magistrate Judge points out, the trial court's reference to Charleston's reputation was "sandwiched between sentences referring to Charleston's prior convictions." R&R at 42. Accordingly, "[r]ather than objecting and having the court focus its attention even further on Charleston's prior convictions, perhaps even repeating that he had two theft convictions and one conviction for unauthorized use of a vehicle, counsel may have strategically chosen to remain silent on the issue." *Id.* With respect to the prejudice element of *Strickland*, the Magistrate Judge concluded that "it is unlikely that the jury was well-versed in Pennsylvania evidentiary law or that it appreciated the distinction between Charleston's prior convictions and a reputation for untruthfulness" and, furthermore, "the jury had other reasons to question Charleston's credibility," including the *crimen falsi* evidence and the discrepancies between his version of events and the physical evidence set forth at trial. *Id.* Accordingly, the Magistrate Judge concluded that Charleston "has failed to establish a reasonable probability that counsel's failure to object to the judge's use of the term reputation during the charge affected the outcome of the trial." *Id.*

After de novo review of this matter, the Court adopts the R&R's analysis of this issue and the objection is overruled.

### iii. Objection Five, concerning counsel's failure to request an involuntary manslaughter instruction, is overruled in part.

In his final objection, Charleston argues that his trial counsel was ineffective when he failed to request a jury instruction for involuntary manslaughter.[34] The Superior Court determined that, like Charleston's claim concerning Ms. Stanton's testimony, this claim was waived because Charleston failed to develop an argument for his claim under the *Pierce* test. Further, the court determined that Charleston's claim would not merit relief because, among other things, involuntary manslaughter was not "at issue in the trial." *Charleston*, 94 A.3d at 1026. Moreover, the court's "independent review of the pertinent authority confirm[ed] that there is no arguable merit to [Charleston's] claims" on this issue. *Id.* at 1027. Accordingly, the Superior Court concluded that "[t]rial counsel's strategic decision not to pursue [the] competing theor[y] of . . . involuntary manslaughter with requested instructions had a reasonable basis." *Id.* Finally, the Superior Court stated that it "discern[ed] no basis to find trial counsel ineffective, based on the information supplied by [Charleston], for pursuing his claim of self-defense and presenting the jury with a consistent theme and strategy of the case." *Id.*

---

[34] The trial jury instructed the jury on murder of the first degree, second degree, and third degree. He also instructed the jury on self-defense.

Under Pennsylvania law, the jury may convict a defendant of involuntary manslaughter where the victim's death was "a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner." 18 Pa. Cons. Stat. § 2504(a).

At the state level, Charleston contended that his counsel should have sought instructions for both involuntary manslaughter and homicide by misadventure. Here, although Charleston mentions the homicide by misadventure claim in his Petition, he has not discussed this claim in his briefing and has not objected to the Magistrate Judge's determination that this claim was waived and lacks merit. Accordingly, the Court addresses only Charleston's claim concerning the involuntary manslaughter instruction.

The Magistrate Judge agreed with the Superior Court that Charleston waived this claim by failing to adequately brief it, concluding that Charleston failed to provide any support in his state court briefing for his contention that trial counsel "could have no reasonable basis" for failing to request this instruction. R&R at 37. Likewise, the Magistrate Judge determined that Charleston's assertion that "the outcome of this trial may well have been different" had counsel requested the instruction was insufficient to support an argument for prejudice under *Strickland*.[35]

Beginning with the waiver issue, although it is true that Charleston's PCRA briefing did not include significant analysis for each aspect of this claim, this Court finds that he sufficiently presented the claim. As Judge Olson observed in her dissent:

> [Charleston] allotted over 900 words, approximately four pages, to the portion of his argument addressing counsel's alleged dereliction in failing to seek a jury instruction on involuntary manslaughter and/or homicide by misadventure. . . . He cited to the notes of testimony six times. He cited approximately ten cases from this Commonwealth addressing relevant legal issues. He discussed how these cases were applicable to the case at bar and why he was entitled to relief.

*Charleston*, 94 A.3d at 1035 (Olson, J., dissenting and concurring).

With respect to the merits of this claim, the Superior Court's majority opinion determined—despite a dissent from Judge Olson on this point—that an involuntary manslaughter instruction was not appropriate in this case under Pennsylvania law. As Respondents indicate, this Court is "[b]ound by the state court's determination" on this issue of state law. *See Priester*, 382 F.3d at 402. Accordingly, the Court must defer to the Superior Court's ruling that Charleston was not entitled to an involuntary manslaughter conviction under Pennsylvania law. Further, the Court finds that the Superior Court reasonably concluded that Charleston's counsel was not

---

[35] In the alternative, the R&R agreed with the Superior Court's determination that Charleston would not be entitled to relief on this claim because the facts of the case did not support an involuntary manslaughter instruction.

ineffective when he presented "a consistent theme and strategy of the case" of self-defense, rather than seek an involuntary manslaughter instruction. As the Superior Court observed, in Charleston's statement to Detective Singleton and in his testimony, Charleston maintained that he acted in self-defense. As the Superior Court reasonably concluded, an involuntary manslaughter charge might have obscured this consistent theme. Charleston's objection is therefore overruled in part.

## V.     The Court will not issue a certificate of appealability.

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability (COA). *See* 3d Cir. L.A.R. 22.2. A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). By contrast,

> when the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Id.* "A prisoner seeking a COA must prove 'something more than the absence of frivolity' or the existence of mere 'good faith' on his or her part." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)). But the Supreme Court does "not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus." *Id.* "Indeed, a claim can be debatable even though every jurist of

reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.*

Here, the Court has ruled on the merits of Charleston's first, third, fourth, and fifth claims. The Court denied his second claim on procedural grounds.[36] For the reasons set forth herein and in the R&R, Charleston has not made a substantial showing of the denial of a constitutional right, nor would jurists of reason find the Court's assessment debatable or wrong.[37] The Court therefore finds that a certificate of appealability is not warranted for Charleston's claims.

## VI. Conclusion

After de novo review of the habeas corpus petition and supporting briefs, the state court records, the R&R, and Charleston's objections to the R&R, and for the reasons set forth herein, the R&R is adopted in part. The Court adopts the Magistrate Judge's recommendations with respect to Charleston's first, second, and fourth claims in their entirety. With respect to Charleston's third and fifth claims, the Court does not adopt the recommendation that these

---

[36] The Magistrate Judge, by contrast, recommended also denying Charleston's third and fifth claims —namely, those related to counsel's failure to object to the instruction regarding Ms. Stanton's testimony and counsel's failure to request an involuntary manslaughter instruction—on procedural grounds. This Court, however, reached the merits of those claims.

[37] With respect to the first claim, it is debatable whether Justice Kennedy's *Seibert* concurrence is "clearly established Federal law" for purposes of habeas corpus review, and it is debatable whether the omission of the *Miranda* warnings in this case was deliberate, particularly in view of the fact that the standards governing this analysis are unsettled. *See Capers*, 627 F.3d at 477 (observing that Justice Kennedy did not "explore how a court should determine when a two-step interrogation strategy had been executed deliberately."). Nevertheless, it is not debatable that the admission of Charleston's statement did not have a "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht*. *See Rainey v. Superintendent Coal Twp. SCI*, No. CV 16-3184, 2016 WL 9410906, at *1 (3d Cir. Oct. 27, 2016) (denying COA where petitioner's "claims of trial court error are not debatable because he has not shown that the alleged errors had a 'substantial and injurious effect or influence in determining the jury's verdict'" under *Brecht*). For this reason, a certificate will not issue for Charleston's first claim.

claims be deemed waived; rather, the Court finds that these claims do not merit relief. Accordingly, the Court adopts the Magistrate Judge's conclusion that Charleston is not entitled to relief on any of his claims and the recommendation that his Petition be denied. The Court also adopts the conclusion that there has been no substantial showing of the denial of a constitutional right requiring the issuance of a certificate of appealability.

For the above stated reasons, Charleston's Petition is denied. A separate order follows.


BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge